On September 5, 1947, Rufus Lavelle Davis, age thirteen, was killed as he crossed U.S. Highway 80 at its intersection with State Highway 14. This intersection is four miles east of Monroe, Louisiana, near the Sicard overpass. This is a suit by his parents to recover damages against the driver of the truck, the bakery company which owned the truck, and its insurer.
The petition alleged that the driver of the bakery truck saw the deceased and his brother as they were being discharged from a school bus upon which they were riding; that notwithstanding the fact that he was over 500 feet distant, Harris, the driver of the truck, continued downhill; without warning; without applying brakes; without looking where he was driving, and that he allowed the truck to get beyond his control and to strike their minor son with violent force, causing instant death.
After an exception of no cause of action was overruled, defendants filed a joint answer admitting the ownership of the truck, insurance coverage and the happening of the accident at the intersection described in the petition, but alleged that young Rufus Davis was killed when he ran out into the highway from behind the bus from which he had alighted and into the bakery company's truck. In the alternative, and in the event that the driver of the truck be held negligent, defendants alleged that plaintiffs' minor son was guilty of contributory negligence, and pleaded this as a bar to plaintiffs' recovery.
The case is before us on an appeal from a judgment of the District Court rejecting plaintiffs' demands.
In order to understand the details of the accident, it is necessary that the reader know the road situation at the point of impact and for some 200 feet westward and 700 feet eastward. The impact occurred at the east prong of the Y shaped intersection of State Highway 14 (from the north) and U.S. Highway 80 (running east and west). The east prong of this Y enters U.S. 80 at a point 680 feet west of the crest of the Sicard railway overpass. As U.S. 80 leaves the bridge portion of the overpass, it turns southerly, so that the neutral ground (between the east and west prongs of the Y intersection) is directly ahead of a west-bound vehicle coming down the incline from the overpass. Young Davis' body was found across the black center line of U.S. 80 and opposite the center of the east prong of the Y intersection. From this point, it is approximately 700 feet eastward to the crest of the overpass and approximately 120 feet westward to the western end of the neutral ground between the prongs of the Y.
Plaintiffs introduced in evidence an engineer who had measured along the 820 feet of highway from the crest of the overpass down grade of 5 feet per 100 feet, to the final stopping place of defendant's truck and noted the intervening features and distances; 306.5 feet from the crest of overpass to west end of bridge railing; 89 feet from west end of bridge railing to west end of north curb; 284.8 feet from west end of north curb (along which there is a level six foot shoulder) to east prong of Highway 14 intersection; 24 feet across intersection of U.S. Highway 80 with State Highway 14 (impact was in center of U.S. 80 opposite center of this intersection); 117 feet distance along parkway and north curb of U.S. 80 from the east to the west prong of Highway 14.
Mr. Foster, driver of the school bus, when he heard the noise of impact, was going up grade at a reasonable speed and immediately stopped his bus, 115 feet east of the point of impact, where it remained until the coroner, troopers, etc., arrived. The boy's body remained in the center of the road where it fell and defendant's bakery truck remained across U.S. 80 114 feet west of the point of impact. These distances *Page 626 
were noted by the State Troopers and other witnesses. We therefore know with certainty that the truck driver's only warning was given at a distance of over 600 feet from the intersection and know that the boys were within the view of the truck driver for the last 80 odd feet of his travel preceding the impact. We know that there was slightly over 200 feet of distance between the spot where the truck driver saw the boys in the position of danger and the place he stopped his truck, against the south curb of U.S. Highway 80.
The deceased, Rufus Davis, and his brother, James Davis, age fourteen, who was slightly crippled, had been to Monroe on the day of the accident. Mr. C. L. Foster, an employee of the Ouachita Parish School Board, gave the two boys a ride from the city limits eastward along U.S. Highway 80 to the point where State Highway 14 (on which the boys lived) intersected Highway 80. Mr. Foster expected to continue to his home further eastward and stopped on the right (south) side of U.S. 80 right in the mouth of the east prong of the Y road intersection of U.S. 80 and State Highway 14. leading north. This road intersection is at the foot of the Sicard overpass over the Missouri-Pacific railway. After the boys alighted, and as Mr. Foster started ahead, he observed a truck (defendant's bread truck) coming over the crest (680 feet distant) of the overpass. By the time the school bus had proceeded a hundred feet eastward, the bread truck had passed and Mr. Foster heard the noise made by its striking Rufus Davis or running through the curb and shrubbery. The school bus driver quickly stopped and rushed back to the road intersection, where he found Rufus' body almost in the center of the 22 foot wide road, with his head on the south side of the road and his feet on the north side. James Davis, unhurt, was standing over his brother's body. The truck had proceeded on past the cast arm of the Y intersection and, instead of making the left turn with the road, had continued directly ahead and over the curb into a parkway through the shrubbery and parkway and back into the road and had finally come to a stop headed south with its front wheels against the south curb of Highway 80 and blocking that highway. Its hood was dislodged during its careening progress.
In passing on plaintiffs' allegations of negligence, we have examined carefully what the record establishes as to the speed of defendant's bread truck from the crest of the overpass to the point of collision; the distance the bread truck driver was from the intersection when he observed the Davis boys near the center of U.S. 80 at that intersection (the distance of the school bus from the intersection at the time it was passed by the bread truck determines the spot where the bread truck driver could again see the Davis boys); the action of the bread truck driver in keeping straight ahead, instead of turning to the right after he observed the Davis boys; the defective pull-to-the-left condition of the bread truck's brakes, particularly as this bore on the failure to turn out to the right; and the failure of the bread truck driver to give adequate warning of his approach to the highway intersection after he had seen the boys alight at the southern end and his view of the south half of U.S. 80 was obstructed by the school bus proceeding eastward.
Harris, driver of the bread truck, at the time of the trial, testified that he was traveling 25 — and on cross-examination, possibly 30 — miles an hour at the time he saw the boys near the center of the road. However, he told the State Troopers in answer to their questions as they filled out their routine report, that he was going 45 miles per hour at the time "danger of accident first noticed" and that he had broken down the speed to 35 miles per hour at the time of impact. Young James Davis estimated his speed at 45 miles an hour, but the surest indication in our minds that his truck was making relatively high speed is the fact that it was not brought to a stop until it had gone more than 100 feet beyond the point of impact. During this time, it went over a seven or nine inch curb, down through approximately 100 feet of a dirt neutral ground, straddling hedges and finally came to rest 117 feet from the collision point, with its front wheels against the south curb of the highway. Since we *Page 627 
find that he first observed the boys in the highway when he was 85 feet from the collision point, his truck necessarily traveled over 200 feet between the time he sensed danger and stopped the truck.
There is a table of stopping distances and stopping times contained in a well written article in 14 Tulane Law Review, page 493, and while the special circumstances of each case must also be considered, the table furnishes a useful standard for comparison. At the time of the accident the pavement was dry, the weather clear and conditions were excellent for stopping, with the exception that defendant's truck was traveling downhill. Special circumstances tending to aid the driver in slowing down the truck, were the seven inch curbs around the neutral ground, the breaking effect of the hedges and shrubbery, which the truck straddled, the soft dirt of the neutral ground and the final barrier provided by the south curb of U.S. 80. The table shows that for a speed of 30 miles per hour, a vehicle under average conditions should be stopped in a distance of 83 feet, including reaction time. By comparison, a speed of 50 miles an hour, using the same table, requires a stopping distance, including reaction distance, of 193.7 feet.
Considering all the factors determining this stopping distance, such as speed, momentum and grade, efficiency of brakes, condition of road surface, the obstacles encountered, and the statement of Harris to the investigating police, we conclude that Harris was operating his truck at 45 to 55 miles per hour, a speed negligent under the circumstances.
Harris testified that as he came down grade, his view of the Davis boys was obstructed by the on-coming school bus (which was some eight feet high, eight feet wide and long enough to accomodate fifty or sixty children); that he first saw the children in the road when the cab of his truck was opposite the cab of the school bus, and that, at that time, the boys were coming from directly behind the school bus. On the distance his truck was from the children, his testimony is contradicted by that of the driver of the school bus, the living Davis boy, and all the other witnesses who testified as to the location of the vehicles and the distances involved. Mr. Foster, driver of the school bus, testified that he had moved the bus approximately 100 feet when he heard the noise incident to the impact; that the Davis boy's body was 115 feet back of his truck and that this distance was stepped off after the police got there. The living Davis boy testified that the school bus was 70 or 80 feet away when his brother was struck. Marion Briley, who was on his back porch near by, said the school bus was 90 feet from the point of impact. Two State Troopers estimated this distance (without measuring) as approximately 80 feet. Harris himself, in assisting the State Troopers in the preparation of the accident report on the day it happened, in answer to the question as to the distance he was away when "danger of theaccident first noticed," gave 85 feet as the answer. This admission — made when the accident was fresh in his mind — is in keeping with the testimony of the other witnesses. For instance, Daniel Chriceal, who was stopped on the highway some distance in rear of the school bus, testified that the bread truck was "behind the school bus" at the time the boy came across the center of the road. Harris himself, in answer to the question as to whether he observed the boys between the time he saw them on the shoulder of the road and the time he saw them near the center of the road, gave as the reason for not seeing the boys that "the bus was pulling up." The driver of the school bus testified that he was pulling up at the time the bread truck came over the crest 680 feet away.
The record as a whole convinces us that Harris was mistaken in his testimony at the trial concerning the distance between his truck and the boys at the time his view of them — previously obstructed by the school bus as it proceeded eastward — was uncovered. Foster testified that as soon as the boys alighted, he immediately moved forward and he further stated that his truck had a relatively speedy pick up. The fact that the boys had had time to pass around the rear of the bus and out to the center of the road indicated that the school bus had had time to go forward the distance *Page 628 
Foster testified it had gone. The bread truck driver definitely places his position, at the time he saw the boys in the road, as being in line with the driver's seat (near the front of the school bus), and having placed the spot where the boys began to cross the road with relation to the school bus as being close to 100 feet, we conclude that at the time Harris saw the boys, he was 75 to 100 feet away.
As noted in judicial decisions and leading law journals on control of vehicle and the distance necessary to stop, there must be taken into consideration the "reaction time" of the driver. The average driver requires, after danger is observed, three fourths of a second to make his brakes effective. Defendant's brakes. became effective at a distance of 14 feet from the deceased, as evidenced by the single skid mark along the pavement for the final 14 feet before impact.
At a speed of 55 miles an hour, his truck would cover approximately 60 feet in three fourths of a second, and possibly a few feet more before the brake application reached skid mark effectiveness. Even at 30 miles an hour the "reaction distance" plus the 14 feet skid mark distance would have, of necessity, placed the deceased at more than 40 feet from Harris at the time he sensed danger. In view of the evidence of Harris, the driver, and the other witnesses, that the unfortunate boy, after starting to run, stopped, and instinctively put out his hands, which were struck by the front grill work, throwing his body against the left fender edge where a jagged broken place ripped his back open, it is obvious that, had the truck been turned even a few feet to the right during the approximately 85 feet that the driver traveled after sensing the "danger of accident," his life would have been spared.
The only explanation for the truck's keeping the fatal bee line instead of the indicated normal evasive right turn, is found in the test of the truck after the accident by the State Trooper, which showed that its brakes pulled to the left.
This defective brake condition which caused the truck to pull to the left on application of brakes, is the principal and proximate cause of the accident, if a one principal cause could be assigned to an involved series of incidents leading to a fatality. The boy's body was found across the center line of the highway. All witnesses agreed that young Davis was never more than two or three feet across the center line and into the bread truck's north half of the highway. The truck driver on the trial admitted that he saw the boys 25 to 35 feet in front of him — when talking to the highway officers he had placed this distance at 85 feet — the paved portion of the road was 22 feet wide, and, except for the faulty brakes, there is no explanation as to why the driver should have continued almost straight ahead after seeing the boys' perilous plight. On a 22 foot road a truck would normally stay two or three feet on its own side of the center line as a matter of routine. Not only did the driver not pull to the right before the accident, but he continued straight ahead after the impact, as the photograph of the road shows that the U.S. 80 turns left and the neutral ground which the out of control truck entered after the accident, was straight ahead of the truck as it ran down the unfortunate boy.
The living Davis boy's testimony was that he did not hear the bread truck's horn blow (doubtless he wouldn't at 680 feet) and that the first time he saw the truck was after it had passedthe school bus, and when it was some 40 feet away from his brother, who had seen it first.
The truck driver recognized the necessity for giving warning for his approach to the intersection by sounding his horn when he came over the crest and first observed the boys and the vehicle which had discharged them. However, this warning at 680 feet was ineffective and he was negligent in continuing to approach the intersection without further warning and while his view of what was happening in the south half of U.S. Highway 80 at the intersection was obstructed by the on-coming school bus.
We conclude that the driver of the defendant's truck was negligent in that he, after seeing the boys and the bus over 600 feet ahead of him when he topped the crest, *Page 629 
did not slow down or bring his truck under control, but continued downhill at high speed even though he knew the intersection was in front of him and while his view of the south half of that intersection was obstructed by the on-coming school bus. The defendant's truck driver was further negligent in operating his truck on the highway with improper brakes and in approaching a highway intersection, which had already been pre-empted by the Davis boys, without warning and at such a speed and with his brakes in such condition.
We next consider defendants' defense that the plaintiffs are barred in their recovery by the contributory negligence of their son, who the answer alleged rushed out into the highway from immediately behind the school bus from which he had alighted and into the path of their truck, which he had failed to observe and in running into and against the right (doubtless defendants meant left) front portion of the truck; "and in otherwise violating the provisions of the Louisiana Highway Regulatory Act [Act No. 286 of 1938], common prudence, and the rights of others lawfully using said highway, particularly the said Carl C. Harris."
The first act of contributory negligence alleged is that the deceased failed to accord right-of-way to defendant's truck. We find as a fact that the lad entered U.S. Highway 80 at the intersection point at a time when the truck was approximately 500 feet away, and on the point of who entered the intersection first, the pedestrian had clearly pre-empted the intersection. Pedestrians have the same right to the use of public streets and highways as motorists. Ward v. Donahue, 8 La. App. 335.
As to defendants' second contention that the Davis boy ran into the highway from immediately behind the bus and directly into the path of the truck, when the truck was too close to avoid an accident, we find, as discussed earlier in the opinion, that the school bus had proceeded on up toward the overpass a distance of 75 to 100 feet — 85 feet was the distance given by defendant's driver to the highway officers — and that this distance was "too close to avoid an accident" principally because of the excessive speed and momentum of defendant's truck and the defective condition of its brakes.
On the question of failing to observe defendant's truck, we find the evidence does not show that the deceased looked eastward at the time Harris was at the crest and said he sounded his horn. Due to the obstruction of view by the school bus, defendant's truck was not in view of the deceased as he crossed the south half of the highway, and the defendants have not met the burden of proving negligence in this regard.
As to the final allegation that the deceased was guilty of contributory negligence in running against defendant's truck and otherwise violating the highway regulatory act and "violating the rights of others lawfully using the highway, particularly Carl C. Harris," the testimony shows that the deceased, as he entered the Y intersection and crossed the south half of U.S. Highway 80, did not observe defendant's on-coming truck because his view was obstructed by the school bus as it proceeded up grade and that when he had reached approximately the center of the highway, young Davis first saw the bread truck bearing down on him as it sped past the school bus. Faced with this sudden emergency, he first started to run. An instant later, possibly observing that the truck was coming with such speed and momentum, he decided that to stop might be the better avenue of escape and his maneuver of stopping was almost successful, as only his outstretched hands were struck by the front portion of the truck as it whizzed past; but after the slight contact, his body was turned and the jagged break in the front fender ripped his body open. Numerous cases in Louisiana and elsewhere have held that a person who due to panic does the wrong thing and fails to escape from a position of danger in which the carelessness of another person has placed him, is not responsible for his lack of choosing a different course of action which, from a "hindsight" view would have avoided the accident.
The burden of establishing contributory negligence is upon him who alleges it. The record shows that at the *Page 630 
time Rufus Lavelle Davis entered the intersection, no vehicles were coming from the west. Consequently it was safe for the boy to enter and cross to the center. The record does not show that young Davis would not have been safe at this point had the approaching vehicle been coming at a more reasonable rate of speed, or, regardless of speed, had the brakes not been defective to the extent of pulling the truck to the left. The deceased had the right to assume that any vehicle approaching the intersection from the east would be operated at a lawful rate of speed and that the driver would have same under reasonable control and that its mechanical condition would be such as to permit the normal maneuver in case the circumstances required stopping or turning. A pedestrian is not guilty of contributory negligence in presuming that approaching vehicles will be carefully operated in conformity with highway traffic regulations. Langley v. Viguerie et al., La. App., 189 So. 605.
A careful examination of the record leads to the conclusion that defendants have not established by the preponderance of evidence any of the allegations of contributory negligence contained in the answer.
In the case before us, we differ with our learned brother below on several findings of fact. For instance, his opinion contains a statement that the defendant's truck driver turned his vehicle clear off the road in an effort to avoid the accident. The testimony shows that his vehicle continued straight ahead from the time the driver discovered the boys' peril, and that he entered the neutral ground, not by turning the truck to the right (the evidence showed the impact occurred near the center of the road and the truck driver never turned to the right), but by going straight ahead past the point where U.S. Highway 80, upon which he was traveling, turns to the left. The testimony on this point is borne out by the pictures in the record, showing the body in the center of U.S. 80 and by pictures showing that the left turn of the highway places the neutral ground directly in front of the path of defendant's truck.
Appellate courts should be, and we think always are, reluctant to reverse the judgment of a trial court when questions of fact are involved. The weight of the trial court's finding should be recognized.
However, having determined that the facts of the accident in this case are such that, under the law applicable, the defendants are liable, it becomes our duty to render judgment accordingly.
As usual in cases of this sort, it is extremely difficult for the Court to measure in money the loss which the parents of the deceased have experienced and the principal guide in fixing the award is. the action of Courts in similar cases. We have concluded to award $4500.00 to each parent, and an additional $330.00 to the father for funeral expenses and loss of time.
For the reasons assigned, the judgment appealed from is set aside and judgment is now rendered in favor of plaintiff, William Anthony Davis, and against the defendants, Surebest Bakery, Inc. and National Automobile and Casualty Insurance Company, in solido, in the sum of Four Thousand Eight Hundred Thirty and No/100 ($4830.00) Dollars, and in favor of plaintiff, Mrs. Nancy Lee Davis, and against the same defendants in solido, in the sum of Four Thousand Five Hundred and No/100 ($4500.00) Dollars, both judgments to bear five per cent. per annum interest from judicial demand until paid. Defendants to pay all costs. *Page 631